Good morning. I'm John Rhodes from the Missoula Office of the Federal Defenders of Montana. I represent Jessica Durham. Unless the court has questions about the sentencing error, I'm going to focus argument on the trial error. In doing that, I want to review a few of the key events that happened below that informed the legal issue before the court. First, a forensic toxicologist from the Montana Crime Lab, which is where all the criminal forensics are done for the state of Montana and frequently for the federal prosecutors in Montana, she came into court and testified that if you have a bong and there's residue in the bong, merely by looking at that residue or even by taking the next step and smoking that residue, there's no way that you could tell that that was marijuana. That's the scientist from the Montana State Crime Lab. But at some point she says, well, what I really am is I do the toxicology stuff. I'm not an expert on marijuana. Yeah, she's a toxicologist, which is the study of narcotics in part. That's part of what toxicology is. And she's a forensics toxicologist, which is doing it for purposes of law. Right. But didn't she say, look, I'm not an expert in this area. I don't know for marijuana. Maybe it was a self-serving statement. She did not say at the time she was questioned. I think she did try to backtrack a little bit later on. But when she was pointedly asked if you could tell if the burnt residue was marijuana, she said no. And when she was pointedly asked if you smoked it, could you tell it was marijuana, and she said no. What does that mean? According to her opinion, if a residue is subjected to a laboratory test, it can definitively be determined whether it contains marijuana or not? Is that the thrust of her testimony? You know, I don't believe we know that, Your Honor, because that question wasn't asked. That issue was simply not explored by either our office or by the prosecutor's office. So that information is not in the record. Right. So that means then, it seems to me, her testimony left the issue open. We don't agree. I don't agree with that, Your Honor. I don't think she left the issue open in terms of the type of, quote, testing, unquote, that was done in this case, merely visual inspection of the residue and then smoking it. I think with respect to that, her testimony is abundantly clear. Next, I want to talk about the question of whether or not marijuana is a substance. The testimony of Brandy Nichols, who the trial court, before she testified, identified as, quote, the key witness in the case, and at the end of that bench trial, twice referred to her as an expert in marijuana. Ms. Nichols' testimony, as the courts already inferred, was that by her experience of smoking marijuana thousands of times, that by looking at a residue, she could tell that it was marijuana, and then by smoking that residue, she could also tell it was marijuana. The court, as I said, identified her first as a key witness, then twice called her an expert, and then in the court's finding of facts at ER 226, and then in its conclusions of law at ER 229 and 230, specifically relied on Ms. Nichols' testimony to determine that marijuana was provided to the child. The problem with that is that Ms. Nichols was never qualified as an expert witness. She was proffered as a witness under Rule 701, which, as the court knows, since its amendment in 2000, requires three thresholds to be met in order for the testimony to be admissible. First, the testimony has to be rational. Second, it has to be helpful to the trier of facts. And third, it cannot be based on scientific or specialized knowledge. Here, Ms. Nichols' testimony fails all three steps. First, it's not rational. A scientist, a toxicologist, has testified that visual or ingestion inspection of a burnt residue cannot result in the conclusion that it's marijuana. So Ms. Nichols' testimony was simply irrational, which makes it unhelpful to the trier of facts. Most glaringly, her testimony was based on either scientific knowledge, if you want to look at it from the perspective of a crime lab, or at least based on specialized knowledge. And her specialized knowledge was demonstrated by the government, who made a point to inquire with Ms. Nichols about her extensive or vast experience smoking marijuana. But, you know, that specialized knowledge part of that 701 rule can't mean that something that could be the subject of an expert's knowledge and requires some specialized knowledge can never be introduced by a non-expert. I'll just take an example entirely outside of the context of this case. Let's have a fishing case, and the issue is whether or not the fisherman caught three chinooks or two chinooks and one coho. And he says, well, listen, I know what a chinook looks like, and I know what a coho looks like. That's specialized knowledge that a lot of people have no idea how to differentiate the two, but he's a fisherman and he knows. I used to think that testimony could come in. Arguably it could, Your Honor. Here the problem is we're not dealing with marijuana in its common state, the green leafy bud, that I think many people who have never been exposed to marijuana may be able to identify it through education they've had, through the media. We're dealing with a burnt residue in a bond. And the idea that someone could just look at that and say that that's marijuana, that's specialized knowledge. I'll pick you up on your characterization. You're calling it burnt residue, which in one sense, of course, is right, but Nichols' testimony was, well, there was some chunks of marijuana left. In other words, it was only partially consumed in the prior smoking. Specifically, she first said chunks, but then she said it was burnt. And she always came back to the fact that it was burned residue, and she repeatedly used those phrases. So she clarified that it wasn't actual marijuana chunks of the green leafy plant that people are commonly familiar with. And that's where it goes to the bottom. Well, you're pressing me on my knowledge of marijuana, but my understanding is ordinarily when it's before it's been burnt, it's not green and leafy at that point. Well, it's green, it's a bud. When it's growing in the ground, of course, it's green and leafy. I misspoke there, Your Honor. But aren't the concerns, given the advisory notes, 702, described as an example, somebody who's not an expert in his testimony about something being a narcotic, and I wonder if your distinction between the residue and the com residue, if it goes to the weight that such testimony should receive by the fact finder. Two responses. First, Your Honor, the case cited in the notes speaks to a narcotic, a drug, before it's been ingested. And so we think that's a critical distinction. Because here we're not talking about regular marijuana, we're talking about a burnt residue. And the idea that someone could simply look at a pipe, we've all seen pipes, and say, oh, I can tell that the residue in there is marijuana or tobacco or some other product, that's specialized knowledge. Second, with respect to the weight that the evidence should be given, that was the error of the district court. The district court identified Ms. Nichols twice as an expert in marijuana, and then later in the district courts, both its findings of facts and conclusions of law, relied on Ms. Nichols' testimony to find Ms. Durham guilty beyond a reasonable doubt. But besides relying on her visual observation, she also said she smoked it, right? Yes. And in smoking it, you know, she formed the opinion that it was marijuana that she was smoking. Now, one, that has to be, it seems to me, admissible. And two, it corroborates her visual observation, doesn't it? It could be admissible under Rule 702 if she was qualified as an expert. Why does she have to be an expert? You mean an expert at smoking marijuana? Yeah, an expert at being able to identify her aggressive use of marijuana. Well, I mean, she smoked marijuana thousands of times, so maybe what you're saying is the judge erred in classifying her as a lay witness. Correct. She should have been proffered as a 702 witness with a Daubert hearing pretrial, and then the litigation could have gone from there. That's the error. Basically, the court, or the government, backdoored an expert. So what's the prejudice to you in not explicitly designating her as a Daubert expert? Obviously, there would be a Daubert hearing. We could bring in— Well, who would you bring in at the Daubert hearing that, no, you can't tell from smoking? Sounds like we'd go to the state crime lab and bring in a toxicologist who would say that from smoking a burnt residue, it cannot be identified as marijuana. That would be one person we would go to. I'm sure there are other people across the country we could find, chemists. Well, you already have that testimony, don't you? Yes. So, I mean, what's the prejudice from not holding a Daubert hearing? If we prevail at the Daubert hearing, if the evidence is inadmissible, it never is brought before the trier of fact, and it doesn't end up in the findings of facts and conclusions of law. That's the prejudice. That's the only prejudice you can identify? Well, there also has to do with the pulmonary capacity. The toxicologist said that she couldn't testify to whether it was real. You mean of the 18-month-old? Correct. But that wasn't the subject of her expert testimony. No. She was simply asked about that, and she couldn't render an opinion. The focus is on whether the burnt residue is marijuana. Okay. You've run over your time. Let's hear from the government, from the state, from the government, and then we'll give you a chance to reply. Thank you, Your Honor. Thank you again for the record. My name is Lori Sook. I'm an assistant U.S. attorney from Montana. Your Honors, in this case, it seems to me that we're dealing with apples and oranges. The defense would like to look at Brandy Nichols as a 702 expert. She was never proffered as a 702 expert by the government, and she was not used in that way. And although the district court clearly considered her a key witness, that's not disputed by anyone. She was basically the witness, and then corroborative evidence was included because of how this case developed. And even though the court did say the words that she is an expert in marijuana, that language probably loops on the court's part, because it certainly didn't in any of its findings refer to her as a 702 expert. Ms. Nichols, in this case, was clearly a lay witness with experience extensive in smoking marijuana. She simply described to the trier of fact, in this case the judge, exactly what she saw, why she thought that what she saw was marijuana, what she did with that substance, smoking it, what it did to her, what she smelled, what she knew, her background. That evidence was combined with the corroborative evidence of the landlord who smelled marijuana in the house at the time, of the social workers who observed the behavior of the 18-month-old toddler. So in this case, the issue is whether Brandy Nichols and her testimony really was sufficient for the judge to find, enter a finding of guilty. There is no 702 issue in this case in the view of the United States. When the toxicologist was questioned, and I have to be candid with the court, I wasn't trial counsel. But reading the transcript, which is what you will do, just as I did, it did not appear to me that her testimony was that no one could ever look at resin in a bong and say that it's marijuana, or that smoking it, this came in the context of her expertise and what she knew and what she could do. She was not a marijuana smoker herself and was answering those questions by her expertise and what she could do. That was the reading that I gleaned from the transcript of her testimony. Ms. Nichols clearly had all that the judge needed in terms of her background, in terms of her ability to perceive, in terms of what she herself did and her conduct in this case, for the judge to find her a credible witness and to enter a finding of guilty. Let me change the focus a little bit. The charge here is distribution, right? Yes, it was distribution to a juvenile. Distributing to a minor, right? Yes. In the government's view, does the distribution take place when the mother passes the mouthpiece of the bong to the daughter, or does the distribution actually require inhalation? In the view of the United States, the distribution took place when the marijuana was ingested by the baby, when she was puffing on that and then Ms. Nichols actually saw smoke coming out of her mouth. That was the distribution to the juvenile, particularly in this case when it's an 18-month-old toddler that you're dealing with. So the distribution then, if she had smoke in her mouth, is sufficient. It doesn't have to be inhaled. I mean, into the lungs. Is that... I don't know. That seems to be a contention that the defendant is making,  Well, actually, what I understood that whole line of inquiry to be was whether the 18-month-old juvenile had the ability to pull that smoke up the bong, not actually whether she put it in her lungs. And the testimony from Ms. Nichols was that that actual pulling up of the smoke was done by the mother before the bong was transferred to the baby, for the baby to puff on it. And you could see the smoke coming out of the baby's mouth. And then Ms. Nichols testified that she saw smoke coming out of the baby's mouth. Let me ask you a question about the sentence. Interesting sentencing. It appears to me that the maximum sentence is two years. Do you agree with that? Your Honor, the government's position is that the sentence is ten years. But it seems to me pretty obvious that this qualifies as a small amount not distributed for money, and therefore the maximum sentence is one year, potentially doubled. The reasoning that's been employed by the government in this case is this, that in order to kick in that provision of a small amount of marijuana for remuneration... For non-remuneration, yeah. Yeah. That word. For no money. Yeah, right. There you go. It has to be simply a violation of 841A1. And the Court in this case has found that there actually 859 is not simply a penalty provision, but provides an element. And therefore, in order for that section to kick in, it would have to say that you would be violating 841A1 and 859, because it doesn't, and because there's an additional element that subsection D does not apply. I don't know quite what you mean when you say the Court has found that 859... Well, one court did. The charge was so written that... The charge was written that way. The first judge who considered, well, Judge Siebel, who made the finding of guilt also made a finding on that issue and found that 859 was a substantive charge that the penalty of ten years applied. Because of that additional element. But to call it a substantive charge, that's just a form of word. Versus just a sentencing enhancement. Versus simply just a statute that would enhance the sentence. The judge found that 859 only kicks in by virtue of an additional element. It adds an additional element to the crime of 841A1. And it's not simply just a sentencing enhancement. But 859 is written in terms of a person, in quotes, who violates Section 841A1. Yes. Does that sound like a sentence which is referring to 841 as the most substantive crime? It does. This substantive crime actually is the joining of these two statutes. It's an 841A1 and an 859. There is no specific case law on this point that this circuit has dealt with this issue in terms of similar statutes in this section, public housing or using a juvenile in the distribution, and have found that that is actually not simply an enhancement statute, but adds an additional element to the offense. And we would ask the Court in the same vein to find the same thing here. There would be no reason not to. These are the same types of statutes governing just specific nuances of the general 841A1 statute. May I suggest that there is a reason not to? The reason not to, I suggest, is that though the government's reading may be a permissible textual analysis, I suggest that the defendant's reading is also a permissible textual analysis. The syntax would provide for either interpretation. I don't know whether your government would contest that. Your Honor, it's hard to contest that because you have two district judges who actually decided the issue differently, if you look at the record. That's what I was getting to. The first judge decided it one way with the government's position, and then actually the sentencing district judge reconsidered it, decided it the other way, and then seemed to reverse his decision of the sentencing. But that is the government's position. That reflects the welcome phenomenon that district judges are open-minded. But I didn't mean to suggest in contrast with other categories of judges. But if you'll agree with me, then, that the language is susceptible of more than one reading. Aren't there principles of lenity that incline one to a reading which would not be the government's? There is, Your Honor. The principles of lenity are there for you to consider. The legislative history is there as well. This would certainly run afoul of why the statute was passed if we adopt the defendant's reading. Okay. Thank you. Thank you. Mr. Rhodes, would you like a minute? Yes, Your Honor. I had four points. Quickly, first, the landlord smelling marijuana. The landlord wasn't at the house at the time in question. He testified that at unrelated times, he thought he'd smelled marijuana at the house. Second, the government's contending that it didn't use Ms. Nichols as an expert, that it was the district court that characterized her as an expert in marijuana. If the government wasn't using Ms. Nichols as an expert, why did it elicit from her her extensive involvement with marijuana? So we think that shows the government was trying to backdoor an expert through 701. Next, Judge Tashima, you asked about the prejudice that was suffered by not following the Rule 702 procedures, the Dauber procedures. Ideally, one of the benefits of expert witnesses is they don't have access to grind in litigation. They are coming there representing their expertise and merely providing that to the trier of fact to help adjudicate the issue. Here, Ms. Nichols told law enforcement that she thought Ms. Durham should fry. That was her exact word, fry, for this. That is not an unbiased person who then is permitted to offer what we believe was expert testimony. Finally, going to the . . . That's up to a fact finder to consider, isn't it, the judge? Well, our position is that she should never get to the fact finder because, A, she wasn't qualified under 702, and, B, that's exactly the sort of bias that the gatekeeping function is supposed to preclude from ever getting to the fact finder. Finally, with respect to the toxicologist and what her testimony was regarding the visual inspection of a burnt residue, she was asked, is it fair to say that just by looking at that pipe, you couldn't determine what precise chemical compounds were present in that residue? She responded, it's correct to say that you could not. That's at ER 181. I think there she's not speaking from her . . . Personally, she's saying as a scientist, you couldn't visually inspect the residue and reach a conclusion. And on the next page at ER 182, and I won't take up the time to read it to the court, she does the same thing. She's speaking based on experience and scientific standards in her response, not based on her personal viewpoint. And we think that shows why the district court erred in relying on Ms. Durham's testimony to find . . . sorry, relying on Ms. Nichols' testimony to find Ms. Durham guilty beyond a reasonable doubt. Okay. Thank you very much. The case of United States v. Durham is now submitted for decision. The next case on the argument calendar is now, and I'm not sure I'm pronouncing it right, Bleasner v. Communicational Workers of America.
judges: Tashima, W. Fletcher, Pollak